**UNITED STATES of America, Appellant,**

v.

**I. Marco L. LAURENTI, E. Giorgio L. Laurenti, Lindar Manufacturing Corp., Rockhill Cutlery Ltd., Rockwell Co., Appellees.**

**No. 767, Docket 78–1002.**

United States Court of Appeals, Second Circuit.

Argued May 1, 1978.
Decided July 19, 1978.

---

Peter C. Salerno, Asst. U. S. Atty., New York City (Robert B. Fiske, Jr., U. S. Atty. for the Southern District of New York, Audrey Strauss, Asst. U. S. Atty., New York City, of counsel), for appellant.

Stuart A. Jackson, Burns, Jackson, Miller, Summit & Jacoby, New York City, for appellees I. Marco L. Laurenti, Lindar Manufacturing Corp., Rockhill Cutlery, Ltd., Rockwell Co.

Frank H. Wright, New York City (Norman S. Ostrow, Grand & Ostrow, New York City, of counsel), for appellee E. Giorgio L. Laurenti.

Before MOORE, OAKES and GURFEIN, Circuit Judges.

OAKES, Circuit Judge:

The Government appeals, pursuant to 18 U.S.C. § 3731,[1] from orders of the United States District Court for the Southern District of New York, Thomas P. Griesa, Judge, dismissing an indictment on the ground of preindictment delay[2] and denying a motion for partial reargument.[3] The dismissal was not based on the Sixth Amendment, the Fifth Amendment, the Speedy Trial Act, or the Southern District Plan for Prompt Disposition of Criminal Cases. Rather, it was grounded on the district court's interpretation of 19 U.S.C. § 1604,[4] a provision of the Tariff Act of 1930. We hold that even if Section 1604 applies to criminal cases, dismissal of an

---

[1]. It provides in pertinent part:

In a criminal case an appeal by the United States shall lie to a court of appeals from a decision, judgment, or order of a district court dismissing an indictment or information as to any one or more counts, except that no appeal shall lie where the double jeopardy clause of the United States Constitution prohibits further prosecution.

18 U.S.C. § 3731.

[2]. The decision was rendered from the bench on November 14, 1977. Trial Transcript at 248–63.

[3]. *United States v. Laurenti*, No. 76 Cr. 663 (S.D.N.Y., filed Dec. 22, 1977). The Government urged that while § 1604 might be a proper basis for dismissing charges of customs law violations, such as 18 U.S.C. § 542, *see* note 5 & accompanying text *infra*, it could not be invoked to dismiss charges of general false statements under 18 U.S.C. § 1001 or of conspiracy to violate that statute. *See* note 6 & accompanying text *infra*. Our disposition of the case renders this argument superfluous.

[4]. It reads as follows:

§ 1604. Same [referring to seizures]; prosecution

It shall be the duty of every United States Attorney immediately to inquire into the facts of cases reported to him by customs officers and the laws applicable thereto, and if it appears probable that any fine, penalty, or forfeiture has been incurred by reason of such violation, for the recovery of which the institution of proceedings in the United States district court is necessary, forthwith to cause the proper proceedings to be commenced and prosecuted, without delay, for the recovery of such fine, penalty, or forfeiture in such case provided, unless, upon inquiry and examination, such United States attorney decides that such proceedings can not probably be sustained or that the ends of public justice do not require that they should be instituted or prosecuted, in which case he shall report the facts to the Secretary of the Treasury for his direction in the premises.

19 U.S.C. § 1604.

indictment thereunder is improper as without the contemplation of Congress. Accordingly, in this, the first decision ever to rely on Section 1604 as a basis for dismissing an indictment, *see* note 14 *infra*, we reverse in favor of the Government.

The facts of this case require brief discussion. A 71-count indictment was returned on July 15, 1976, after a 16-month investigation involving customs fraud. Count One charged a conspiracy to import goods into the United States by means of false statements, in violation of 18 U.S.C. § 542[5] and to make false statements generally, in violation of 18 U.S.C. § 1001.[6] Counts 2 through 36 charged substantive violations of 18 U.S.C. § 542, each count referring to a particular invoice or customs entry, and Counts 37 through 71 charged parallel violations of 18 U.S.C. § 1001.

The investigation commenced on March 24, 1975, when a former employee of appellee Lindar Manufacturing Corp. (Lindar)

told customs agents that the company was engaged in fraudulent conduct. He furnished the agents documents which revealed that Lindar's principals, appellees I. Marco L. Laurenti and E. Giorgio L. Laurenti, were reporting false purchase prices to customs in connection with their business of importing scissors and other cutlery products purchased from foreign manufacturers.[7] Customs agents thereafter obtained search warrants which were executed at the Lindar offices on March 26, 1975.[8] The United States Attorney's office became involved in the investigation in late March, 1975. It was lengthy due to numerous discussions with appellees, two stages of grand jury proceedings, extensive evaluation of appellees' seized documents, preindictment litigation commenced by appellees, and additional evidence gathering after the seizure.[9] It was not until June 28, 1976, however, that the Customs Service formally referred the case to the United States Attorney for the Southern District of New

---

**5.** 18 U.S.C. § 542, codified in "Chapter 27—Customs" of the criminal code, provides in relevant part:

§ 542. Entry of goods by means of false statements

Whoever enters or introduces, or attempts to enter or introduce, into the commerce of the United States any imported merchandise by means . . . of any false statement, written or verbal, . . . whether or not the United States shall or may be deprived of any lawful duties; or

Whoever is guilty of any willful act or omission whereby the United States shall or may be deprived of any lawful duties accruing upon merchandise embraced or referred to in such invoice, declaration, affidavit, letter, paper, or statement, or affected by such act or omission—

Shall be fined for each offense not more than $5,000 or imprisoned not more than two years, or both.

Nothing in this section shall be construed to relieve imported merchandise from forfeiture under other provisions of law.

**6.** It states:

§ 1001. Statements or entries generally

Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to con-

tain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

18 U.S.C. § 1001.

**7.** One document, allegedly in the handwriting of Giorgio Laurenti, refers to an "Official Customs Price List," to be given customs officials, and a "Confidential Price List," containing "the real actual prices" that the manufacturer was charging the company.

**8.** They seized 35 cartons of documents and most of the company's inventory. That same day they also obtained 700 file folders from Lindar's customs broker.

**9.** Between March 26, 1975, and April 30, 1975, several meetings were held between appellees' attorneys and Government counsel, initially concerning appellees' innocence, later concerning possible return of the merchandise and documents. Grand jury proceedings continued intermittently from mid-April, 1975, through June of that year. In late April, appellees moved for return of the seized material. The motion was denied by Judge Pierce on May 2. Then, on June 26, 1975, a formal motion for return of the goods under Federal Rule of Criminal Procedure 41(e) was made. The Government did not respond until the end of July, assertedly because the answer required an inventory of the seized documents. We are advised that an oral decision denying the motion

York, requesting the initiation of prosecution.[10] The indictment was finally returned on July 15, 1976.

Appellees moved to dismiss the indictment on October 12, 1976, claiming preindictment delay. They urged that their rights under 19 U.S.C. § 1604 and the Fifth and Sixth Amendments had been violated. Because we agree with the district court that absent Section 1604 the indictment could not have been dismissed,[11] the only question presented is the propriety of the dismissal thereunder.

The parties principally direct their arguments to whether Section 1604 applies in criminal proceedings. Neither the language nor the legislative history of the statute provides a clear answer.[12] In our view, however, assuming both that the provision extends to criminal cases and that it

---

was rendered sometime in August, and that an order to this effect was signed on September 22, 1975.

In September, 1975, a second round of discussions between the Government and defense counsel resumed. According to the Government, new exculpatory explanations offered at this time required additional investigation. Meanwhile, from May through November, 1975, seized documents were matched with documents actually submitted to customs, a time-consuming process. Translation problems complicated the process.

On April 29, 1976, the Laurentis were arrested. At this point, proceedings before the grand jury intensified; the Government obtained several immunity orders and orders compelling testimony of witnesses. During May and June, new defense counsel evidently pursued plea bargaining discussions. At their request, the imminent indictments were postponed first until late May, and then through June. After it became apparent on July 9 that appellees would not plead guilty, the indictment was returned on July 15, 1976.

10. The letter apparently was not received until August 2, 1976. The cause of this delay is unknown.

11. The Speedy Trial clause of the Sixth Amendment is not implicated until indictment or arrest. *United States v. Marion*, 404 U.S. 307, 320–21, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971). Federal Rule of Criminal Procedure 48(b) (permitting dismissal of indictments for preindictment delay) is limited to post-arrest delay. *Id.* at 319 & n. 11, 92 S.Ct. 455. Similarly, the Speedy Trial Act, 18 U.S.C. §§ 3161–74, by its terms quite clearly does not apply to preindictment delay. *See United States v. Mejias*, 552 F.2d 435, 440–43 (2d Cir. 1977), *cert. denied*, 434 U.S. 847, 98 S.Ct. 154, 54 L.Ed.2d 115 (1977). Moreover, there is no indication of prejudice to appellees' defense from the delay, "a necessary but not sufficient element of a due process claim." *United States v. Lovasco*, 431 U.S. 783, 790, 97 S.Ct. 2044, 2049, 52 L.Ed.2d 752 (1977); *see United States v. Marion, supra*, 404 U.S. at 324–26, 92 S.Ct. 455. Also determinative of appellees' due process attack, there is no proof of deliberate delay on the part of the

Government to obtain a tactical advantage. *United States v. Lovasco, supra*, 431 U.S. at 795, 97 S.Ct. 2044; *United States v. Marion, supra*, 404 U.S. at 324, 92 S.Ct. 455. In fact, appellees' own attempts to discourage prosecution may have contributed to prolonging the investigation. *See* note 9 *supra; United States v. Lane*, 561 F.2d 1075, 1076–77 (2d Cir.), *cert. denied*, 434 U.S. 969, 98 S.Ct. 515, 54 L.Ed.2d 456 (1977).

12. Some language of the statute imposing expeditious commencement of "proceedings . . . for the *recovery* of such fine, penalty, or forfeiture" (emphasis added), tends to indicate that criminal proceedings were not contemplated. An indictment does not seek the *recovery* of anything. *See Sullivan v. United States*, 348 U.S. 170, 171–72, 75 S.Ct. 182, 99 L.Ed. 210 (1954) (so construing similar language in a tax statute). On the other hand, § 1604 refers to "fine[s]," a term also found in the criminal provisions under which appellees were indicted. *See* notes 5–6 *supra*.

The legislative history relied on by the district court is not inconsistent with appellees' position that § 1604 was intended to refer both to civil and criminal proceedings. The Act of July 18, 1866, ch. 201, 14 Stat. 178 (1866), was declared "strictly penal" by the Supreme Court in *Stockwell v. United States*, 80 U.S. (13 Wall.) 531, 551, 20 L.Ed. 491 (1871). The Court rejected the importer's contention that § 4 of the 1866 Act, authorizing criminal punishment by fine or imprisonment for customs fraud, superseded a provision of an earlier statute, Act of 1823, ch. 58, § 2, 3 Stat. 781 (1823), providing for recovery of double the value of the goods. It held that the earlier provision was civil, while the 1866 Act was criminal. Sections 1602–04 were derived from Section 7 of the Act of 1866, which required "prosecut[ion] without delay." It provided:

Sec. 7. *And be it further enacted,* That it shall be the duty of the several collectors of customs to report within ten days to the district attorney of the district in which any fine or personal penalty may be incurred for the violation of any law of the United States relating to the revenue, in all cases in which

was violated here—matters which we need not decide—violation of the statute does not warrant dismissal of an indictment.[13]

That this is the first instance in which any sanction has been afforded a criminal defendant in over a hundred years of the statute's administration is of itself not without significance.[14] But more persuasive, perhaps, is the fact that Section 1604 does not expressly confer any rights upon any defendant, civil or criminal.[15] We are guided by the reasoning of former Chief

such fine or penalty shall not be voluntarily paid, a statement of all the facts and circumstances of the case within their knowledge, together with the names of the witnesses, and which may come to their knowledge from time to time, stating the provisions of the law believed to be violated, and on which a reliance may be had for a condemnation or conviction; and such [a] district attorney shall cause suit and prosecution to be commenced and prosecuted without delay for the fines and personal penalties by law in such case provided, unless upon inquiry and examination he shall decide that a conviction cannot probably be obtained, or that the ends of public justice do not require that a suit or prosecution should be instituted, in which case he shall report the facts to the Secretary of the Treasury for his direction; . . . and if any collector shall in any case fail to report to the proper district attorney, as prescribed in this section, such collector's share of any fine or penalty imposed or incurred in such case shall be forfeited to the United States, and the same shall be awarded to such persons as may make complaint and prosecute the same to conviction.

Thus, the statutory predecessor to § 1604 was an act prohibiting criminal conduct.

Additionally, the structure of the Tariff Act of 1930, ch. 497, tit. IV, part V, 46 Stat. 590 (1930), suggests that § 1604 was intended to cover criminal proceedings. Part V, governing "Enforcement," contains provisions authorizing criminal penalties, § 591, and civil penalties, § 592, for customs fraud. Section 591 provides that "upon conviction [such person shall] be fined for each offense . . ., or be imprisoned . . ., or both." Section 592 provides for forfeiture without mentioning the term "fine." The same Part V also contains § 1604's predecessor, § 604, which is identical to § 1604 for our purposes. There is nothing to indicate that § 604 was not intended to apply both to §§ 591 and 592. It refers to "fine[s]" and "penalt[ies]," as does § 591. Appellees urge that in 1948, when § 591 was recodified in the Federal Penal Code, 18 U.S.C. § 542, see note 5 supra, Congress did not intend to alter the coverage of § 1604. We note, however, that if Congress believed that § 1604 applied to criminal proceedings, it certainly could have recodified this provision in Title 18.

When § 1604 and its predecessors are viewed in an historical context, the unclarity of its coverage is compounded. The Government emphasizes that the purpose of § 1604's "with-

out delay" language was to direct expeditious enforcement of the customs laws not for the benefit of criminal defendants, but for the benefit of the public. It points out that speed in collecting customs duties was essential in the past, because these duties constituted the principal source of federal revenues from 1789 until World War I. *Encyclopedia of American History* 733 (R. Morris ed. 1976). This view is supported by prior customs acts containing predecessor provisions to those in question here, which expressly provide in their preambles that their purpose is to provide revenue. *E. g.*, Act of March 3, 1863, ch. 76, 12 Stat. 737 (1863) ("An act to prevent and punish Frauds upon the Revenue, to provide for the more certain and speedy Collection of Claims in Favor of the United States . . . ."). Also significant is the existence of "without delay" language in statutes governing civil penalties for customs violations. *E. g.*, Act of March 2, 1799, ch. 22, § 89, 1 Stat. 627, 695–96 (1799). *See Stockwell v. United States, supra,* 80 U.S. (13 Wall.) at 542–43, 551–52.

13. Judge Griesa did not address the propriety of imposing particular sanctions under § 1604 in his oral decision dismissing the indictment, *see* note 2 supra. His discussion was limited to the statute's applicability in criminal proceedings and, having found in the affirmative, the Government's failure to comply with § 1604's dictates.

14. We have been unable to locate any decision dismissing an indictment for failure to comply with § 1604. There is an unreported opinion, *United States v. Browning, Inc.*, No. Cr. 76–46(3) (D.Utah, filed Sept. 14, 1976), which states in dictum that an indictment may be dismissed under 19 U.S.C. § 1603 if the Customs Service fails to make a prompt referral to the United States Attorney. In reversing on other grounds, the Tenth Circuit commented that dismissal would be inappropriate under § 1603 apparently because there was no seizure in that case. It did not mention the language which seems to impose a reporting duty even in the absence of a seizure. *United States v. Browning, Inc.*, 572 F.2d 720, 726 (10th Cir.), *petition for cert. filed*, 46 U.S.L.W. 3710 (U.S. May 16, 1978) (No. 77–1576).

15. We are aware of decisions dismissing civil forfeiture actions for undue delay under §§ 1603 and 1604. *See, e. g., United States v.*

Judge Blumenfeld in *United States v. Filiberti*, 353 F.Supp. 252 (D.Conn.1973). There, the defendant was indicted, over four years after the substantive offense allegedly occurred, for fraudulently concealing and transferring assets of a bankrupt corporation. Without claiming prejudice from the delay, the defendant moved to dismiss the indictment on the basis of a bankruptcy statute, 18 U.S.C. § 3057.[16] Aside from its explicit applicability to criminal cases, the bankruptcy statute is very similar to Section 1604, directing the United States Attorney to present the matter to the grand jury "without delay" while not on its face conferring any procedural rights on a defendant. Based on the absence of remedial language, coupled with the provision's obvious purpose simply to encourage swift resolution of bankruptcy proceedings, Chief Judge Blumenfeld held that it did not authorize dismissal of an indictment for the Government's noncompliance. He stated:

> It is not surprising that such a provision has found its way into the bankruptcy

statutes, where the concern for speedy administration of bankruptcy estates is particularly strong. Wrenched from its context, the above-quoted segment of the statute appears to be a severe restriction on the well-recognized discretion accorded prosecutors regarding the initiation of criminal proceedings. However, the words immediately following make any such reading of the statute untenable, for the United States Attorney may decide "upon inquiry and examination . . . that the ends of public justice do not require investigation or prosecution, in which case he shall report the facts to the Attorney General for his direction." 18 U.S.C. § 3057(b). The presence of this language further supports the view that § 3057 was intended primarily as an administrative measure—a congressional directive to the district offices of the United States Attorneys to become more active in the prosecution of bankruptcy fraud cases.

*One 1970 Ford Pickup*, 564 F.2d 864 (9th Cir. 1977); *United States v. One Motor Yacht Named Mercury*, 527 F.2d 1112 (1st Cir. 1975); *Sarkisian v. United States*, 472 F.2d 468 (10th Cir.), *cert. denied*, 414 U.S. 976, 94 S.Ct. 291, 38 L.Ed.2d 219 (1973); *see also United States v. Thirty-Seven Photographs*, 402 U.S. 363, 373–74, 91 S.Ct. 1400, 28 L.Ed.2d 822 (1971). The existence of a remedy of dismissal in civil actions, however, does not necessarily imply the availability of this sanction in criminal actions. In civil cases, failure to provide a prompt hearing as to the property seized raises due process considerations. *See Lee v. Thornton*, 370 F.Supp. 312, 318–24 (D.Vt.1974) (three-judge court), *vacated on other grounds*, 420 U.S. 139, 95 S.Ct. 853, 43 L.Ed.2d 85 (1975). These aside, considerations unique to criminal proceedings are also implicated. *Cf. Board of Curators of the Univ. of Mo. v. Horowitz*, 435 U.S. 78, 84–86, 98 S.Ct. 948, 952–953, 55 L.Ed.2d 124 (1978) (reiterating that the procedures mandated by due process vary depending on the circumstances of each case). For example, the possibility of stigmatization from the filing of criminal charges counsels against fostering premature prosecution by threatening the Government with dismissal, even at the cost of delays which might be intolerable in the case of property seized without a hearing. *See post* at 43–44. Additionally, the public's interest in enforcing criminal laws has a different basis than its interest in revenue collection; the lat-

ter does not involve any considerations of order, deterrence or the like.

**16.** It provides:

 (a) Any referee, receiver, or trustee having reasonable grounds for believing that any violations of the bankruptcy laws or other laws of the United States relating to insolvent debtors, receiverships or reorganization plans has been committed, or that an investigation should be had in connection therewith, shall report to the appropriate United States attorney all the facts and circumstances of the case, the names of the witnesses and the offense or offenses believed to have been committed. Where one of such officers has made such report, the others need not do so.

 (b) The United States attorney thereupon shall inquire into the facts and report thereon to the referee, and if it appears probable that any such offense has been committed, shall without delay, present the matter to the grand jury, unless upon inquiry and examination he decides that the ends of public justice do not require investigation or prosecution, in which case he shall report the facts to the Attorney General for his direction.

18 U.S.C. § 3057. Subsection (b) is much like § 1604 here. *See* note 4 *supra*. Subsection (a) corresponds to 19 U.S.C. § 1603.

353 F.Supp. at 253 (footnote omitted).[17] Quite clearly, concern for the speedy administration of the customs laws also underlies Section 1604. The federal treasury used to depend very heavily on customs revenues, and it was to the advantage of the public, not of fraud defendants, that the statute was directed. *See* note 12 *supra* ; *cf. Cort v. Ash*, 422 U.S. 66, 78, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975) (one factor in determining whether cause of action is implicit in unexpress statute is whether statute was enacted especially for plaintiff's benefit). Moreover, it is difficult to interpret the clauses imposing a duty on the United States Attorney "immediately to inquire into the facts of cases reported to him by collectors," and "forthwith to cause the proper proceedings to be commenced and prosecuted, without delay" as having been intended by Congress to restrict the prosecutor's discretion to the extent of imposing the severe sanction of dismissal of a indictment. For the following clause which permits him not to proceed when he believes that "the ends of public justice do not require" implies that Congress's purpose was not to alter the prosecutor's usual broad discretion in initiating criminal proceedings. Additionally, if the United States Attorney decides not to prosecute, he must report the facts to the Secretary of the Treasury who is under no obligation to act with speed. *See United States v. Thirty-Seven Photographs*, 402 U.S. 363, 369 n. 2, 91 S.Ct. 1400, 28 L.Ed.2d 822 (1971). These latter clauses convince us that, as in the case of Judge Blumenfeld's bankruptcy statute, Section 1604 was intended primarily "as an administrative measure—a congressional directive to the . . . United States Attorneys to become more active in the prosecution of [customs] fraud cases."[18] 353 F.Supp. at 253. Were the statute more than this, that is, were it a speedy indictment and trial act for criminal customs cases, one would suppose that Congress would have set some specific deadlines, as it did in the Speedy Trial Act itself. 18 U.S.C. § 3161–74. Here there are simply generalities—"immediately" to inquire, "forthwith" to commence prosecution, to prosecute "without delay." *See* note 4 *supra*.

Policy considerations of high moment also impel us to conclude that Section 1604 does

---

**17.** Additionally, Judge Blumenfeld noted that the defendant's interpretation of § 3057 "would make that statute unique in criminal procedure, for 'the applicable statute of limitations . . . is . . . the primary guarantee against bringing overly stale criminal charges.' " *United States v. Filiberti*, 353 F.Supp. 252, 253 (D.Conn.1973) (quoting *United States v. Marion, supra*, 404 U.S. at 322, 92 S.Ct. 455). This reasoning is equally persuasive on the instant facts.

**18.** Our reading of § 1604 is consonant with numerous Supreme Court decisions recognizing that mandatory language may be no more than a guide to government officials, a violation of which will not benefit the affected party. *See, e. g., Sullivan v. United States*, 348 U.S. 170, 173, 75 S.Ct. 182, 99 L.Ed. 210 (1954) (U.S. Attorney's failure to obtain advance authorization of Attorney General before presenting evidence of tax violations to grand jury, in violation of Justice Department directive, not a ground for dismissing indictment because directive was merely a "housekeeping provision"); *Erhardt v. Schroeder*, 155 U.S. 124, 128–30, 15 S.Ct. 45, 39 L.Ed. 94 (1894) (government failure to follow procedures for valuing imported goods). Congress may employ language mandatory on its face without intending a penalty for the Government's failure to comply. *See United States v. Morgan*, 222 U.S. 274, 280–81, 32 S.Ct. 81, 56 L.Ed. 198 (1911); *cf. Scott v. United States*, 436 U.S. 128, 145, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978) (Brennan, J., dissenting) (characterizing majority's refusal to allow suppression of intercepted conversations when no attempts to minimize the intrusion were made as "a linguistic *tour de force* . . . convert[ing] the mandatory language that the interception 'shall be conducted' to a precatory suggestion" in disregard of congressional purpose (emphasis in original)); *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978) (holding 25 U.S.C. § 1302(8), providing that "[n]o Indian tribe in exercising powers of self-government *shall* . . . deny . . . the equal protection of its laws" (emphasis added) not to imply civil injunctive or declaratory relief against a tribe's officers notwithstanding both the act's clear purpose to afford American Indians constitutional rights and the statute's mandatory language). *But see United States v. Giordano*, 416 U.S. 505, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974) (Attorney General's omission to execute wiretap authorization invalidated conviction where statutory language was not literally mandatory).

not authorize dismissal of an indictment. The construction urged by appellees could encourage investigation of customs cases with undue haste, a circumstance as disadvantageous to defendants as to the Government itself. *See, e. g., United States v. Lovasco,* 431 U.S. 783, 793, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977) (rejecting contention that due process requires immediate prosecution as soon as sufficient evidence to obtain a conviction exists because such pressure might cause unwarranted prosecutions); *United States v. DeMasi,* 445 F.2d 251, 255 (2d Cir.) (rejecting constitutional attack on preindictment delay because "careful investigation, even at the price of delay, is to be cherished, inasmuch as '[t]ime-consuming investigation prior to an arrest minimizes the likelihood of accusing innocent parties and may facilitate the exposure of additional guilty persons' " (citation omitted)), *cert. denied,* 404 U.S. 882, 92 S.Ct. 211, 30 L.Ed.2d 164 (1971). Additionally, United States Attorneys, beset as they are with the Speedy Trial Act's time constraints, would be required to place extraordinary priority on customs cases over all other criminal cases governed solely by Sixth and Fifth Amendment precepts. We cannot ignore recent Supreme Court pronouncements on the limited protection against preindictment delay afforded by the Fifth and Sixth Amendments. Necessitating prejudice to the defense [19] as a prerequisite to invoking due process guarantees, *see* note 11 *supra,* and recognizing that statutes of limitations provide the primary protection against preindictment delay, *see* note 17 *supra,* the Court has cautiously considered and disapproved of the effects likely to flow from a more protective approach. We are hesitant to interpret an ambiguous statute, with an uncertain and rather confused legislative and codification history, in a manner that could undermine this careful balance of policies.

**19.** The Supreme Court has emphasized in recent cases that absent a showing of actual prejudice, even in the face of a constitutional attack governmental misconduct will not necessarily result in dismissal of an indictment or reversal of a conviction. *See, e. g., Weatherford v. Bursey,* 429 U.S. 545, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977) (undercover agent present at

The dismissal of the indictment having been improper, we reverse the judgment below.

Judgment reversed and cause remanded.

attorney-client meetings); *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976) (failure of prosecutor to disclose evidence to defense); *Hampton v. United States,* 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976) (illegal police activity not amounting to entrapment).